**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

QUEST DIAGNOSTICS INCORPORATED.,

                Plaintiff,

   -against-

THE GERRY HOMES,

                Defendant.

------------------------------------------------------------X

**COMPLAINT**

Civil Action No. _____

Plaintiff QUEST DIAGNOSTICS INCORPORATED ("Plaintiff" or "Quest"),

through its attorneys, The Glennon Law Firm, P.C., asserts the following upon

information and belief, except for those allegations pertaining to Plaintiff, which is on

personal knowledge, for its complaint against Defendant The Gerry Homes ("Defendant"

or "Gerry Homes") as follows:

## NATURE OF THIS ACTION

1.      Nursing homes have been the epicenter of the COVID-19 pandemic in the

United States. It has been widely reported "that nearly 1 in 10 people who lived in

nursing homes in the United States had died of the virus." *See* Jay Caspian Kang, *The*

*Forgotten Nursing-Home Tragedy*, N.Y. Times, dated November 4, 2021:

https://www.nytimes.com/2021/11/04/opinion/nursing-home-deaths.html. During the first

months of the pandemic, the United States faced severe shortages and delays in

diagnostic testing. *See, e.g.*, *Despite Early Warnings, U.S. Took Months To Expand*

*Swab Production For COVID-19 Test*, National Public Radio, last visited dated May 12,

2020: https://www.npr.org/2020/05/12/853930147/despite-early-warnings-u-s-took-

months-to-expand-swab-production-for-covid-19-te.

2.      On May 10, 2020, former Governor Andrew Cuomo issued an executive order mandating that all nursing homes and adult care facilities in the state must test their staff two times per week. *See* Executive Order 202.30, dated May 10, 2020, https://www.governor.ny.gov/sites/default/files/atoms/files/EO202.30.pdf (the "Executive Order").  The Executive Order directed that nursing homes and other adult care facilities "shall cooperate fully with Department of Health and local health department staff to facilitate such testing."

3.      In furtherance of the directives in the Executive Order, the Department of Health entered into a written contract with Plaintiff to provide COVID-19 testing to nursing home personnel. *See* COVID-19 Laboratory Testing Services Agreement, dated May 18, 2020 (the "DOH Contract"). Under the terms of the DOH Contract, Plaintiff agreed to provide 7,500 COVID-19 tests per day to all personnel[1] of nursing homes and adult care facilities, adult homes, enriched housing programs and assisted living facilities ("Facilities") in New York starting in June 2020.  *See id.* Plaintiff agreed to charge no more than $100 per test and that it would establish mechanisms for payment, which may have included invoicing the nursing home facilities directly for the testing services on an account bill basis.

4.      On or about October 9, 2020, and October 18, 2020, Plaintiff entered into agreements with long term care facilities owned and operated by Defendant ("Defendant's Facilities") whereby the Defendant's Facilities engaged the Plaintiff to

---

[1]      Personnel included all employees, contracted staff, medical staff, operators, and administrators of Facilities, all of whom were required to be tested twice per week under the Executive Order.

provide COVID-19 testing to Defendant's Facilities's employees (the "Agreements"). The Agreements also provided that Plaintiff would charge no more than $100 per test.

5.      In accordance with the DOH Contract and the Agreement with Defendant, Plaintiff provided thousands of COVID-19 PCR tests for personnel and staff at Defendant's Facilities. Defendant accepted Quest's testing services, provided specimens to Quest for testing and received from Quest the test results for Defendant's personnel and staff. After rendering testing services, Quest sent invoices to the Defendant on a monthly basis, which charged $100 per test—the rate set by the DOH Contract and the Agreement. Defendant did not object to the accuracy of the sums owed as stated in the invoices, or the $100 per test rate, while Quest was providing services to Defendant. To date, Defendant have refused to pay these invoices without a reasonable or proper justification. Accordingly, Defendant are liable to Quest for breach of contract, account stated, collection and litigation expenses (including among other things, attorneys' fees and costs), unjust enrichment, quantum meruit, in an amount no less than $345,800.00, plus statutory pre-judgment interest in the amount of 9 percent (9%) per annum.

## THE PARTIES AND JURISDICTION

6.      The Plaintiff is incorporated under the laws of Delaware, and has a principal place of business in Secaucus, New Jersey. Accordingly, Plaintiff is a citizen of Delaware and New Jersey for the purposes of diversity jurisdiction.

7.      Upon information and belief, Defendant The Gerry Homes is a non-profit organization incorporated under the laws of New York State with a principal place of business at Route 60, Gerry, New York 14740 and operates Orchard Grove Residences in Jamestown, New York, which is a 36 bed assisted living residence; Bergquist Memorial

Assisted Living Residences in Gerry, New York, which is a 32 bed assisted living

residence; Heritage Green Rehab & Skilled Nursing in Greenhurst, New York, which is

a 134 unit long term care facility; and Heritage Park Rehab & Skilled Nursing om

Jamestown, New York, which is a 146 bed long term care facility. Accordingly,

Defendant is a citizen of New York for the purposes of diversity jurisdiction.

8.     This Court has diversity jurisdiction over the claims asserted in this Action

pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the

parties and the amount in controversy exceeds, exclusive of interests and costs, the sum

of seventy-five thousand dollars ($75,000.00).

9.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a

substantial part of the events or omissions giving rise to Plaintiff's claims occurred within

this judicial district.

## STATEMENT OF FACTS

10.     Quest offers access to diagnostic testing services for a wide variety of

conditions, including cancer, cardiovascular disease, infectious disease, neurological

disorders, and COVID-19.

11.     From the outset of the COVID-19 pandemic in or about early 2020, New

York experienced a surge in COVID-19 cases and mortalities compared to other states at

that time. The COVID-19 pandemic was particularly acute in nursing home and long-

term care facilities in New York.

12.     To address the mounting crisis posed by COVID-19, former Governor

Cuomo issued Executive Order 202.30, which provided in relevant part:

> "the operator or administrator of all nursing homes and all
> adult care facilities, including all adult homes, enriched

housing programs and assisted living residences to test or make arrangements for the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, twice per week, pursuant to a plan developed by the facility administrator and filed with the Department of Health . . . . the operator and administrator shall cooperate fully with Department of Health and local health department staff to facilitate such testing."

"The Commissioner of Health is authorized to suspend or revoke the operating certificate of any nursing home or adult care facility if it is determined that such facility has not complied with this Executive Order . . . ."

"Any nursing home or adult care facility which does not comply with this Executive Order shall be subject to a penalty for non-compliance of $2,000 per violation per day, . . . and any subsequent violation shall be punishable . . . with a penalty of $10,000 per violation per day."

"Any personnel of a nursing home or adult care facility who refuse to be tested for COVID-19 pursuant to a plan submitted to the Department of Health shall be considered to have outdated or incomplete health assessments and shall therefore be prohibited from providing services to such nursing home or adult care facility until such testing is performed." *See* Executive Order 202.30.

13.     Hence, the Executive Order placed obligations on Facilities to test staff for COVID-19 twice per week. The Executive Order also called for the imposition of sanctions for the failure to comply with the directive, including fines of up to $10,000 and the suspension of personnel who refused to test.

## QUEST'S CONTRACT WITH NEW YORK STATE TO PROVIDE COVID-19 TESTS

14.     In furtherance of the Executive Order, Quest entered into a written agreement with the DOH, dated May 18, 2020, to provide COVID-19 PCR tests and related services to certain Facilities in New York State (the "DOH Contract"). A true and

correct copy of the DOH Contract is attached hereto as **Exhibit A**. Among other things,

Quest agreed to provide such Facilities:

> "testing for the detection of COVID-19 using a COVID-19 molecular test that has Emergency Use Authorization (EUA) from the U.S. Food and Drug Administration (FDA) or that has been approved by the New York State Department of Health as a laboratory developed test"

> "a daily minimum of COVID-19 Testing at a daily average rate of 7500 tests per day . . . , pursuant to electronic orders from the Facilities' medical directors, or other medical professional as otherwise approved by NYS and agreed upon by Lab Provider, who are authorized under state or federal law or guidance issued by federal or state authorities to order such laboratory tests."

> "turn-around time for reporting and resulting from receipt of the specimen may vary based upon population served, demand and priorities among patients but Lab Provider's will be required to provide no less than 90% of the results within 3-4 days or less from accessioning at the lab on average." *See* DOH Contract ¶ 5(a), (b), (d).

15.     Under the DOH Contract, Quest agreed "that the rate for testing will be no greater than One Hundred Dollars ($100.00) in accordance with [CMS Ruling CMS-2020-01-R] https://www.cms.gov/files/document/cms-2020-01-r.pdf, or a lesser rate for comparable testing if the foregoing is modified by CMS for each completed COVID-19 PCR test reported or lower rate agreed to by the Lab Provider and Facility." *See* DOH Contract ¶ 7.

16.     The DOH Contract further provided that Quest "will establish, the mechanism for payment, which may include, but is not limited to, invoicing the Facility directly for the Testing Services on an account bill basis or the Facility's (or its employees to the extent applicable) insurance provider (e.g., individual and small group comprehensive health insurance, commercial insurance, or self-funded policies or

contracts, Medicaid/Medicare or other federal funding sources, if applicable ("third party payors"))." *See* DOH Contract ¶ 7.

17.     Additionally, the DOH Contract stated that, "[i]n the event that [Quest] experiences any collection issues, [Quest] shall provide NYS with written notice of such collection issues and upon demonstration that the [Quest] and/or [the nursing home] Facility has made reasonable efforts to obtain payment and has been denied payment from all applicable or appropriate third-party payors NYS will assist the [Quest Diagnostics] and/or Facility in seeking reimbursement from such third-party payors, federal funding sources and/or other funding sources, as applicable . . . ."  *See* DOH Contract ¶ 7.

## QUEST'S CONTRACT WITH DEFENDANT'S FACILITIES

18.     Quest and Defendant's Facilities performed pursuant to the Agreements, under which Quest was responsible for providing to Defendant's Facilities operating under the names Bergquist Memorial Assisted Living Residences, Heritage Park Rehab & Skilled Nursing, and Heritage Green Rehab & Skilled Nursing laboratory services in connection with, and for Defendant's Facilities' compliance with, the NYS Executive Order 202.30, including reference to the DOH Contract, a copy of which is an attachment of Facilities' Contracts. A true and correct copy of the Facilities' Contracts are attached hereto as **Exhibit B-1, B-2, and B-3** ("Facilities' Contracts").

19.     Specifically, the recitals in Facilities' Contracts states in relevant part:

> "WHEREAS, in light of EO 202.30 and the ongoing Disaster Emergency, LTC Facility hereby engages Quest Diagnostics to perform the required COVID-19 testing for its staff and employees (the "Covered Employees") in

compliance with and during the effective term of EO 202.30, and as may be extended or modified from time to time by Governor Cuomo and/or New York State;"

20.     Further paragraph 3.1 of Facilities' Contracts state:

"3.1 Quest Diagnostics shall have the right to bill LTC Facility for the Testing Services performed pursuant to this Agreement, and LTC Facility shall reimburse Quest Diagnostics for SARS-CoV-2 RNA (COVID-19), Qualitative NAAT, Test Order Number 39448 at rate of $100.00 per test.

21.     Further paragraph 3.2 of Facilities' Contracts provide for attorneys' fees and costs and expenses incurred in collecting sums owed to Quest, including litigation and related expenses; specifically, the Facilities' Contracts provided:

"3.2 LTC Facility agrees to make payment to Quest Diagnostics by check, ACH payment, certified money order, or electronic wire within thirty (30) days of the date of each Quest Diagnostics invoice for laboratory services, after which any undisputed unpaid invoice amounts shall be overdue. Where available, LTC Facility will be invoiced monthly via Quest Diagnostics eInvoice (Quest web-based invoicing system) or other similar electronic invoicing system. Paper invoices may incur additional fees. In the event that Quest Diagnostics sends the account for collection and/or initiates litigation in order to collect overdue amounts, LTC Facility shall be liable for all costs and expenses of such collection and/or litigation, including reasonable attorneys' fees, court costs and expenses."

22.     Defendant's Facility operating under the name Orchard Groves Residences did not enter into a written agreement with Plaintiff for Quest to provide laboratory services in connection with, and for Defendant's Facilities' compliance with, the NYS Executive Order 202.30. The Orchard Groves Residences preformed in the same

manner as the contracted facilities and received laboratory services from Quest in the same manner as the contracted facilities.

### DEFENDANT'S FACILITIES UTILIZED QUEST'S COVID-19 TESTING SERVICES AND REFUSED TO PAY QUEST

23.     In accordance with the terms of Executive Order and Facilities' Contracts, Defendant's Facilities utilized Quest's COVID-19 testing services in order to test its staff and personnel twice per week. Specifically, Quest performed over 610 tests for Orchard Grove Residences, 633 tests for Bergquist Memorial Assisted Living Residences, 4,152 tests for Heritage Park Rehab & Skilled Nursing, and 4,480 tests for Heritage Green Rehab & Skilled Nursing, for a total of over 9,875 tests between June 2020 and December 2020.

24.     Quest provided testing services Orchard Grove Residences. Orchard Grove Residences Implied Contract was ratified by Orchard Grove Residences by their acceptance and continued use of Quest's services. Orchard Grove Residences and Defendant never objected.

25.     Pursuant to Defendant's Facilities' Contracts, Quest sent invoices to Defendant's Facilities on a monthly basis for its COVID-19 testing of Defendant's Facilities staff and personnel. In accordance with Paragraph 7 of the DOH Contract and paragraph 3.1 of Defendant's Contracts, Quest billed Defendant $100 per COVID-19 test performed. Under the terms of the invoices, Defendant's Facilities were required to remit payment to Quest within thirty (30) days of receipt.

26.     To date, Defendant's Facilities have refused to pay the balance from any of these invoices.  According to Quest's invoices, Defendant and Defendant's Facilities

owe Quest an outstanding balance of $345,800.00 for COVID-19 testing, of which $4,700 was incurred for Orchard Grove Residences, $18,800 was incurred by Bergquist Memorial Assisted Living Residences, $211,100.00 was incurred by Heritage Park Rehab & Skilled Nursing, and $111,200.00 was incurred by Heritage Green Rehab & Skilled Nursing. *See* Invoices for Orchard Grove Residences attached hereto as **Exhibit C-1**, Invoices for Bergquist Memorial Assisted Living Residences attached hereto as **Exhibit C-2**, Invoices for Heritage Park Rehab & Skilled Nursing attached hereto as **Exhibit C-3**, and Invoices for Heritage Green Rehab & Skilled Nursing attached hereto as **Exhibit C-4**. Quest's invoices reflect the balances after accounting for payments from third party payors, including insurance proceeds.

27.     Quest's efforts to collect outstanding balances from third party sources were unsuccessful.

28.     In accordance with Paragraph 7 of the DOH Contract, on or about May 28, 2021, Quest sent a written notice to the DOH advising that it was experiencing collection issues for laboratory testing services related to the Executive Order. Specifically, in its letter, Quest informed the DOH that it was owed millions of dollars from dozens of Facilities including, among others, Defendant. Quest further advised:

> "The Agreement allowed for flexibility in the billing mechanisms to be used by Quest Diagnostics and most of the Facilities were set up as account bill such that the Facilities would be invoiced for testing services, but we have also attempted to do third party billing to payers based on requests from certain of the Facilities. Despite repeated collection attempts made by Quest Diagnostics to the Facilities and extensive efforts to submit claims to third party payers where requested by the Facilities, Quest Diagnostics has received no concrete assurances of payment from any source for a significant portion of the services we have performed."

## DEFENDANT REFUSED TO PAY THE INVOICES

29.     Defendant and Defendant's Facilities have advised Quest in writing that they will not pay Quest's invoices, and directed it to seek payment from other sources, including third-party payors. Defendant—with full knowledge of the contents and amount of the invoices—did not allege that Quest failed to perform the COVID-19 testing set forth in the invoices.

## FIRST CLAIM FOR RELIEF
### *Breach of Contract*

30.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "29" above with the same force and effect as if fully set forth herein.

31.     Quest and Defendant's Facilities operating under the names Bergquist Memorial Assisted Living Residences, Heritage Park Rehab & Skilled Nursing, and Heritage Green Rehab & Skilled Nursing executed Facilities' Contracts for services to be rendered, which included confirmation that the cost per test would be up to $100.00. *See* Exhibit B

32.     Defendant's Contracts with Quest was ratified by Defendant's performance pursuant to the Contracts' terms for services to be rendered, which included confirmation that the cost per test would be up to $100.00. *See* Exhibit B.

33.     Plaintiff provided COVID-19 testing for Defendant's Facilities personnel in accordance with the terms of Facilities' Contracts. Specifically, Plaintiff provided over 9,875 tests for Defendant's Facilities between June 2020 and December 2020.  Plaintiff

provided timely invoices to Defendant's Facilities for the COVID-19 tests it performed

under the Facilities' Contracts and the DOH Contract.

34.    Defendant never objected to the accuracy of the sums owed as stated in

the invoices submitted to it for the services and, in fact, accepted those services.

35.    In breach of Facilities Contracts, Defendant and Defendant's Facilities

failed and refused, despite due demand, to pay Plaintiff the sum of $345,800.00 for

COVID-19 testing on behalf of Defendant and Defendant's Facilities, which occurred

between June 2020 and December 2020.

36.    By reason of the foregoing breach of the Agreement, Plaintiff has been

damaged in the amount $341,100.00, together with applicable pre-judgment interest

thereon.

## SECOND CLAIM FOR RELIEF
### *Breach of the Implied Contract*

37.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs "1' through "36" above with the same force and effect as if fully set forth

herein.

38.    Plaintiff performed COVID-19 testing services on Orchard Grove

Residences' employees and personnel on and between June 2020 and December 2020.

39.    The COVID-19 testing services performed by Plaintiff were completed at

the request of and for the benefit of on Orchard Grove Residences.

40.    Orchard Grove Residences accepted said COVID-19 testing services

performed by Plaintiff by causing and requiring its employees and personnel to submit

specimens for testing and on Orchard Grove Residences accepted the results of said COVID-19 testing.

41.     The performance of COVID-19 testing services by Plaintiff and acceptance of these services by on Orchard Grove Residences gives rise to a valid and enforceable implied-in-fact contract, with a reasonable value of said services of $4,700.00.

42.     By reason of the foregoing breach of the implied-in-fact contract, Plaintiff has been damaged in the amount of $4,700.00, together with appropriate pre-judgment interest thereon.

### THIRD CLAIM FOR RELIEF
***Breach of the DOH Contract***

43.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "42" above with the same force and effect as if fully set forth herein.

44.     Even if Defendant contests the validity of the Facilities' Contracts, nevertheless, Defendant and Defendant's Facilities caused or required its personnel to submit to COVID-19 tests twice per week and submitted those tests to Quest for laboratory testing and therefore accepted the test results without objection, in order to comply with Executive Order 202.30. Therefore, Defendant and Defendant's Facilities assumed the DOH Contract and ratified its terms to Quest's benefit, including to pay for the testing performed by Quest, with full knowledge of its obligations to pay Quest for such testing.

45.     Defendant and Defendant's Facilities therefore assumed the responsibilities and terms of the DOH Contract by accepting Quest's testing services without raising any objections until months later.  *See Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. Alliance, Inc*., 2007 WL 1701813, at *5 (S.D.N.Y. June 12, 2007).

46.     Defendant and Defendant's Facilities assumed the obligations of the DOH Contract by its conduct recognizing the existence of the DOH Contract by:

  a.   Causing or requiring  its employees to submit samples or COVID-19 testing to comply with Executive Order 202.30.

  b.   Submitting those samples to Quest for COVID-19 testing.

  c.   Accepting the results of Quests COVID-19 testing of Defendant's Facilities employees.

  d.   Acknowledging that it faced substantial fines if it did not comply with Executive Order 202.30 by requiring or causing its employees to be tested for COVID-19, demonstrating that Defendant and Defendant's Facilities were the real parties in interest under the DOH Contract;

  e.   The conduct of the parties recognized the existence of the DOH Contract and its terms; therefore, Defendant and Defendant's Facilities assumed the rights and obligations of the DOH Contract.

47.     In breach of the assumed contract, Defendant and Defendant's Facilities have refused, despite due demand, to pay Plaintiff the sum of $345,800.00 for COVID-19 testing on behalf of Defendant and Defendant's Facilities, which occurred between June 2020 and December 2020.

48.     By reason of the foregoing breach of the DOH Contract, Plaintiff has been damaged in the amount of $345,800.00, together with applicable pre-judgment interest thereon.

## FOURTH CLAIM FOR RELIEF
### *Account Stated*

49.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "48" above with the same force and effect as if fully set forth herein.

50.    Plaintiff sent and rendered to Defendant's Facilities the following statements of account and invoices for COVID-19 testing services provided by Plaintiff to Defendant's Facilities:

ORCHARD GROVE RESIDENCES (Exhibit C-1)

| Invoice No. | Invoice Date | Invoice Amount | Past Due Amount | Total Balance Due |
|---|---|---|---|---|
| 9190666533 | 12/28/2020 | $4,700.00 | $27,500.00 | $32,200.00 |

BERGQUIST MEMORIAL ASSISTED LIVING RESIDENCES (Exhibit C-2)

| Invoice No. | Invoice Date | Invoice Amount | Past Due Amount | Total Balance Due |
|---|---|---|---|---|
| 9190182445 | 11/24/2020 | $18,800.00 | $20,000.00 | $38,800.00 |

HERITAGE PARK REHAB & SKILLED NURSING (Exhibit C-3)

| Invoice No. | Invoice Date | Invoice Amount | Past Due Amount | Total Balance Due |
|---|---|---|---|---|
| 9190182462 | 11/24/2020 | $81,300.00 | $205,200.00 | $286,500.00 |
| 9190666516 | 12/28/2020 | $29,800.00 | $287,800.00 | $317,600.00 |

HERITAGE GREEN REHAB & SKILLED NURSING (Exhibit C-4)

| Invoice No. | Invoice Date | Invoice Amount | Past Due Amount | Total Balance Due |
|---|---|---|---|---|
| 9190182450 | 11/24/2020 | $87,400.00 | $108,900.00 | $196,300.00 |
| 9190666504 | 12/28/2020 | $23,800.00 | $196,300.00 | $220,100.00 |

True and correct copies of these statements of accounts and invoices are collectively attached hereto, and incorporated herein, as **Exhibit C1-C4.**

51.     Defendant's Facilities received, accepted and retained all of said invoices and account statements. Defendant's Facilities did not raise an objection to Plaintiff's invoices. As set forth above, none of Defendant's Facilities objections to Plaintiff's invoices are reasonable. The New York DOH has explicitly agreed that $100 per COVID-19 test—which is the rate Plaintiff has charged—is reasonable, as reflected in Paragraph 7 of the DOH Contract. Moreover, Defendant's Facilities agreed in the Facilities' Contract that $100 per COVID-19 test is reasonable.

52.     Defendant and Defendant's Facilities continued to make payments to Plaintiff for the past due amounts owed under the invoices, leaving a remaining balance due of $345,800.00, of which $4,700 is owed by Orchard Grove Residences, $18,800 owed by Bergquist Memorial Assisted Living Residences, $111,100.00 owed by Heritage Park Rehab & Skilled Nursing, and $111,200.00 owed by Heritage Green Rehab & Skilled Nursing.

53.     As a result of the foregoing, an account was taken and stated between Plaintiff, Defendant and Defendant's Facilities, which showed a balance, in the amount of $345,800.00, is due and owing by Defendant and Defendant's Facilities to Plaintiff.

54.     No part of said balance due in the amount of $345,800.00 has been paid by Defendant or Defendant's Facilities, despite due demand therefor.

55.     By reason of the foregoing, Defendant and Defendant's Facilities are presently indebted to Plaintiff in the sum of $345,800.00, together with applicable interest thereon.

## FIFTH CLAIM FOR RELIEF
### *Costs and Attorneys' Fees*

56.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "55" above with the same force and effect as if fully set forth herein.

57.     The Facilities Contracts includes a fee-shifting provision in Paragraph 3.2, which provides that in "the event Quest Diagnostics sends the account for collection and/or initiates litigation in order to collect overdue amounts, LTC Facility [Defendant's Facilities] shall be liable for all costs and expenses of such collection and/or litigation including reasonable attorneys' fees, court costs and expenses." *See* Facilities' Contract ¶ 3.2, Ex. B1-B3.

58.     Defendant's Facilities never objected to any of the terms in the Agreement or the invoices submitted to them for the services, but they did accept the services.

59.     Quest demanded payment under the Agreement numerous times, prior to commencing this action.

60.     By reason of Quest having to enforce its rights by collection and litigation, Defendant and Defendant's Facilities are liable to Quest for Quest's costs, expenses, and attorneys' fees incurred in attempting to collect and litigate to enforce the Facilities' Contract and receive payment from Defendant and Defendant's Facilities, together with applicable pre-judgment interest thereon.

## SIXTH CLAIM FOR RELIEF
### *Unjust Enrichment*

61.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "60" above with the same force and effect as if fully set forth herein.

62.     In the event that it is found that no contract exists between Plaintiff and Defendant or Defendant's Facilities, Defendant and Defendant's Facilities are liable to Plaintiff for the COVID-19 testing services they received from Plaintiff.

63.     It would be against equity and good conscience to allow Defendant and Defendant's Facilities to retain the benefit of Plaintiff's COVID-19 testing services—and its corresponding ability to remain an ongoing operation under the Executive Order 202.30—without paying for it, particularly at the reasonable charge of $100 per test.

64.     Defendant and Defendant's Facilities have been unjustly enriched at Plaintiff's expense in the principal amount of $345,800.00, plus pre-judgment interest.

## SEVENTH CLAIM FOR RELIEF
### *Quantum Meruit*

65.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "64" above with the same force and effect as if fully set forth herein.

66.     During the period between June 2020 and December 2020., Plaintiff rendered COVID-19 testing services to Defendant's Facilities, and incurred expenses on Defendant and Defendant's Facilities behalf, in furtherance of Executive Order 202.30.

67.     Defendant and Defendant's Facilities accepted and received the benefits of Plaintiff's services with knowledge that Plaintiff expected to be compensated for same.

68.     The fair and reasonable value of the services rendered by Plaintiff—for

which payment by Defendant has not been made—equals or exceeds the sum of

$345,800.00, which reflects the reasonable rate of $100 per COVID-19 test.

69.     By failing and refusing to pay Plaintiff for the services rendered,

Defendant and Defendant's Facilities has been unjustly enriched.

70.     By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but reasonably believed to be no less than $345,800.00, together with

applicable interest thereon.

### EIGHTH CLAIM FOR RELIEF
***Money Had and Received***
***(FEMA Reimbursement)***

71.     Plaintiff repeats and realleges each and every allegation contained in

paragraphs "1" through "70" above with the same force and effect as if fully set forth

herein.

72.     In addition to its contractual liabilities as hereinbefore alleged, upon

information and belief, Defendant and Defendant's Facilities were/are also entitled to

reimbursement for expenses incurred for testing its employees and personnel for COVID-

19 from the Federal Emergency Management Agency ("FEMA").

73.     If, in fact Defendant and/or Defendant's Facilities have applied for and

have been reimbursed by FEMA for expenses they incurred in testing its employees and

personnel for COVID-19, any such money received and possessed by Defendant and

Defendant's Facilities, and for which they are benefitting, is money that in equity and

good conscience should not be retained by Defendant or Defendant's Facilities, but

should be turned over to Plaintiff, to whom it rightfully belongs by virtue of the COVID-19 testing it performed at the request of, and for, Defendant's Facilities.

74.     By reason of the foregoing, the reimbursement of COVID-19 testing expenses provided by FEMA to Defendant and/or Defendant's Facilities is properly money had and received by Defendant and/or Defendant's Facilities that in equity and good conscience should be turned over to Plaintiff, the amount of which will have to be determined at trial, together with pre-judgment interest thereon.

## DEMAND FOR JURY TRIAL

75.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this matter.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendant as follows:

a.  On its First Claim for breach of contract, awarding Plaintiff damages against Defendant in the amount of $341,100.00, together with applicable interest thereon;

b.  On its Second Claim for breach of implied contract, awarding Plaintiff damages against Defendant in the amount of $4,700.00, together with applicable interest thereon;

c.  On its Third Claim for breach of the DOH Contract, awarding Plaintiff damages against Defendant in the amount of $345,800.00, together with applicable interest thereon;

d.  On its Fourth Claim for account stated, awarding Plaintiff damages against Defendant in the amount of $345,800.00, together with applicable interest thereon;

e.  On its Fifth Claim for collection and litigation costs, expenses, and reasonable attorneys' fees, awarding Plaintiff damages against Defendant in an amount to be determined, together with applicable interest thereon;

f.  On its Sixth Claim for unjust enrichment, awarding Plaintiff damages against Defendant in the amount of $345,800.00, together with applicable interest thereon;

g.  On its Seventh Claim for quantum meruit, awarding Plaintiff damages against Defendant in the amount of $345,800.00, together with applicable interest thereon;

h.  On its Eighth Claim for money had and received, awarding Plaintiff damages against Defendant in an amount to be determined at trial, together with applicable interest thereon;

i.  Awarding Plaintiff costs and disbursements of this case, prejudgment interest, and such other and further relief as the Court may deem just and proper.

Dated: December 9, 2022
       Rochester, New York

Respectfully Submitted,

THE GLENNON LAW FIRM P.C.

By:  */s/ Peter J. Glennon*
Peter J. Glennon, Esq.
*Attorneys for Plaintiff*
*Quest Diagnostics, Inc.*
160 Linden Oaks,
Rochester, NY 14625
585-210-2150
Email: PGlennon@GlennonLawFirm.com